Our next case for argument is Deslandes v. McDonald's. Deslandes v. McDonald's USA LLC Good morning, Judge Easterbrook, and may it please the Court. My name is Dean Harvey and I represent the plaintiffs' appellants Leinani Deslandes and Stephanie Turner. Whether the ultimate analysis here is the result of a presumption or of market analysis, the basic question is the same. Did the challenge conspiracy reduce competition during the class period? We are fortunate here that there is no need to speculate or guess about the answer to this critical question. The record contains an ideal natural experiment to test this question with market factors. I'm a little puzzled by references to the record as I'm puzzled by the appearance of boxes of documents at your opponent's table since this case was dismissed on the pleadings. Yes, Your Honor, but that's not the only order we challenge in this appeal. We request that the Court's order granting judgment on the pleadings be reversed as well as its denial of class certification and our denial of our motion for summary judgment with respect to McDonald's competitive justifications. The record in this case, perhaps in that box, contains an ideal natural experiment to test this dispositive question with market facts. So let me ask you this, Mr. Harvey. It's been something that I've been thinking about. It seems unusual for these kinds of questions, particularly judgment on the pleadings, to be assessed essentially in hindsight. A certain action was taken then because of the Washington State Attorney General's order. Life went on under a different regime, so we know what it's like afterwards. But is that enough to tell us that the preexisting arrangement was suspect? There are a lot of things companies can do. It's not like a binary choice. Yes, Your Honor, I think the first step in that analysis, I think, is to acknowledge the severity of the restraint itself. And you're focusing on labor markets. Just to be clear, because there's a lot of talk back and forth about what's the market that ought to be the basis of decision. Yes, absolutely. The plaintiff class, the proposed class, consists of workers at McDonald's. And the relevant area of competition is for competition among thousands of independent direct competitors for their labor. These thousands of direct competitors for the labor of members of the class agreed to eliminate all price and non-price competition among each other nationwide. And they did it with respect to all of their workers. So what's the significance of being a McDonald's-only class? Your opponents are saying, well, of course, there's a distinctiveness about McDonald's. But I wonder, to take a more ordinary antitrust scenario, if 20 percent of the car manufacturers in this country decided to get together and fix prices on cars that they were selling, it wouldn't matter that there was robust competition from the other 80 percent. Price fixing of the type I'm describing is per se illegal, and we don't worry about market power. It seemed to be a bad enough thing. So your – because there's a huge labor market for people at the skill level and the, you know, all the rest of it for fast food restaurants, for local retail, for all of these things, a very big labor market. So isn't your point that just there's a significant part of that labor market that's been tied up because of these provisions in the contracts? Yes, Your Honor. And let me address that point squarely because I think, you know, at the start of your question, you described whether it's a single brand restraint or if it's multiple. I think McDonald's would like to rely on cases that discuss an intra-brand restraint. Here, as the district court correctly recognized at the outset when it denied the motion to dismiss, that may be true for consumers of burgers, but this case is not about consumers of burgers. It is about workers. And the different competing brands, these thousands of independent employers, are not the same brand to these workers. Plaintiff DeSlanda's worked for a company called Bambi Enterprises, not for McDonald's. Bambi signed her paychecks, not McDonald's. And the restraint required these thousands of independent employers to behave in ways totally inconsistent with a single brand market. Well, and McDonald's has vigorously denied any co-employer status, has it not? Correct. And it says as much in the franchise agreements. This was a point it made in its statement of facts at summary judgment. This is important to McDonald's because it doesn't want to be liable for overtime offenses, for discrimination, and so forth. And that is critical to the franchise system. So, for instance, one of McDonald's amici represents the entire franchise system. It's the Franchise Trade Association. And perhaps inadvertently, in their brief, they, I think, have a very revealing and correct and appropriate description of the franchise system,  So you can go into a McDonald's in Chicago and a McDonald's in Florida and order a Big Mac and you're confident it's going to taste the same and be prepared in the same way. But with respect to the employees, they are direct competitors. And so with respect to market power and how this restraint was able to injure the class, I think it's critical here to recognize that, first, we establish market power through direct evidence. First point. But second point, I think there is sometimes a presumption from someone looking at this case for the first time. And this goes to your question of, how could this restraint possibly suppress wages? Because of all the other brands out there, all other restaurant chains, Burger King, Kinko's, et cetera. And a critical point here is that McDonald's makes reasonable substitution impossible. It prohibits substitution. And here's why. In every McDonald's restaurant location in the country, whether it's operated by a franchise or McDonald's corporate, has five standard titles. Two crew titles and three management titles. In order to go up the ranks, you have to start at the bottom, have minimum training and minimum experience. First, before someone from outside the system, the only time someone from outside the system can start to work is as an entry-level crew in training. On your view, is that also a violation of the Sherman Act? We do not challenge that, Your Honor. I didn't ask that question. How about the question I did ask? No. We do not challenge. Is that equally a horizontal restraint affecting the labor market? It is a horizontal restraint. All right. So the question then becomes, if you're going to say that that is not an antitrust violation, how do you draw the line between those labor market restraints that are permissible and those labor market restraints that are impermissible? What's the distinction? The restraints on training you mentioned are arguably reasonably necessary to the franchise system. They're arguably. Anything is arguably something. Well, I'm asking you for what the real line is, not can you argue something. I think here, I would answer that question with respect to the record and the facts. The restraints you mentioned – I'm not asking about here. Right? This case is not about that issue, but I'm trying to figure out where antitrust law draws a line. It might be possible to say there can't be any labor market restraints in a McDonald's franchise contract, but you've told me that that's not your position. Then I want to know where you draw the line, how antitrust law draws the line, and you can't answer that by reference to this complaint or this record. It's a question of law. Whether the restraint is reasonably necessary to the franchise system and whether it's reasonably tailored to serve the legitimate interests of the franchise system. So doesn't that take you squarely into the ancillary restraints analysis that the district court – Sure does. Yes. Again, I think the restraint you mentioned – As soon as you say that, we're out of per se land, and we're in the world of trying to figure out whether something is an ancillary restraint. If you want to be in per se land, you have to answer my question that the five levels and the rules of training, they're all illegal per se, but you've chosen a different path. And so let's talk about ancillary restraints. I would love to, Your Honor. But first, if I may, even literal price fixing under BMI is still subject to the ancillary restraint doctrine. That doesn't mean the restraint itself isn't appropriately per se. You start with the restraint itself. The restraint should be per se, but then you ask the question, well, is it an ancillary restraint, which can take it out of the per se category. But I want to emphasize that that does not change the severity of the restraint itself, and that should be kept in mind throughout. With respect to the ancillary restraints doctrine, McDonald's is asking this court to do something it has never done, which is to say that a company can satisfy the ancillary restraints doctrine even in a situation where the restraint is egregiously overbroad beyond anything that could conceivably serve the interests of the service. So in other words, you're saying once you get to ancillary restraints, you have to ask what is the ancillary restraint, and if it extends out to Neptune, and if it extends until the end of time, it may easily be seen as a quick look kind of unreasonable ancillary restraint. Correct. Because of the franchise system, we certainly have acknowledged from the start, and the district court acknowledged from the start, that you should give McDonald's a chance to justify the restraint. We don't oppose that. But what we say is that they have failed to satisfy their burden, and under these facts, no reasonable jury, if it's a question of fact, or certainly if it's a question of law on the basis of the record. I am continued to be puzzled by your reference to these facts and this record when this case was dismissed on the complaint. Why aren't we applying the standard rules for figuring out whether a complaint is sufficient? So maybe do you mean to say as a – I mean, this is not a two-page complaint. It would be helpful if you perhaps relied on the allegation, you know, the well-pleaded complaint as it were, the allegations. There is nothing in the complaint that could satisfy the ancillary restraints doctrine. To the contrary, the complaint – the complaints – In other words, you're just saying you haven't pleaded yourself out of court. We have not pleaded ourselves out of court, absolutely not. That's what I understand. Mr. Brass, you've tried to say two things, and the colloquies have taken you astray. And I'd like to answer to them. First of all, what market are we talking about here? Are we talking about the labor market or are we talking about the market for hamburgers when we talk about ancillary restraints? We're talking about the labor market. This is a labor market case about a proposed class of employees asserting antitrust claims in the labor market challenging a labor market restraint. So what, if anything, is the impact of the labor restraint on pricing of the product? Oh, the product of hamburgers. In the ancillary restraint analysis. Well, first I think that in order to satisfy the ancillary restraints analysis in this context, a McDonald's would have to show a competitive benefit in the labor market. But wait a minute. You're not answering Judge Ripple's question. I think what he's getting at – you are essentially making a monopsony case, right? Which means that maybe the final price of hamburgers would be lower, too. But you could say the same thing if they were producing the hamburgers using slave labor. Then the price of labor would be zero and perhaps the hamburgers would be cheaper. But we don't go there. So what you're trying to do is invert the usual antitrust analysis that's normally in a monopoly situation to that of monopsony. Correct. What we challenge is the exercise of monopsony power, in a sense. But it's a horizontal restraint. Which could lead to cheaper hamburgers. Perhaps. There's certainly nothing in the record to even suggest such a thing. What we know from the record is that when they – Or in the complaint, is what you meant to say. The complaint we're looking at. Your Honor, pardon me if I can make a point. The district court denied the motion to dismiss. Denied it. And then we had two years of discovery. And then a class certification reversed itself, reversed its rulings of law from the motion to dismiss. And then at the motion for judgment on the pleadings, which took place at the summary judgment stage, those were filed at the exact same moment as the summary judgment briefs. The court granted judgment on the pleadings by going beyond the pleadings and making findings of fact. Those were clear errors. If I may, Mr. Strand, coming back again to what you've tried to say before. You, at one point, were about to tell us whether there was any contractual franchise contract restraint on pricing of the product. Is there? There is not. In the franchise agreements, the franchisees are told, expect to compete with other franchisees in the product space and expect to compete with McDonald's itself because we operate our own restaurants. So if you keep wages down, you're going to keep your overhead down and be able to sell a product at a lower price, right? Or they could pocket the anti-competitive gains and use it for some other purpose. I have no idea what they did with their anti-competitive gains. Perhaps, I mean, this is not a question that the Sherman Act entertains. The Sherman Act is based on the fundamental belief that competition results in the best allocation of the nation's resources, not collusion. And if you're able, I mean, a price fixer could come in here and say, well, we made a lot of money from our price fixing, and then we used that money to build another factory and that brought prices down. Or we hired more workers, if you want to invert it in that way. And that kind of justification is simply not cognizable under the antitrust laws. You also were about to tell us about why the restraint was or the justification was, quote, egregiously overbroad and you never got a chance to tell us why. Could you tell us why? That quote is from perhaps the dean of antitrust law, Professor Hobenkamp, who looked at the restraint at issue in this case. And those are his words. He described it as egregiously overbroad. So, for example, McDonald's spends a great deal of effort on appeal and below, arguing that the relevant area of effective competition is purely local. Well, then why in the world was the restraint nationwide? Why was the restraint enforced to prevent movement from workers from California to Florida? There are hundreds of examples in the record of the restraint being enforced to prohibit movement across states, across thousands of miles. There's no possible justification for this. And McDonald's refers back all the way to the Mitchell case from 1711 and says, you know, this is where the rule of reason comes from. It's from non-compete cases.  So, you know, kind of prototypical pro-competitive example of using a non-compete clause. And the restraint itself was limited in time and limited to the area right around where the bakery was operating. This is a 1711 case. The requirement to tailor the restraint to the justification has been part of competition law before the Sherman Act existed and before this nation was founded. And I can see that I'm well out of time for my initial remarks. If not, is there any other questions I'll set? I hear none. Thank you very much. Mr. Strand. I'm sorry. May it please the Court, I'm Strand on behalf of the United States and the Federal Trade Commission. We appear today to address the legal framework governing no-hire agreements in the franchise setting, and we take no position on the ultimate disposition of the appeal. The district court correctly recognized that franchise no-hire agreements can be horizontal and that if horizontal, they are per se legal unless ancillary. But in granting defendants' motion for judgment on the pleadings, the district court misapplied the ancillary restraints doctrine. The court held that the no-hire agreement was ancillary because it was, quote, But to be ancillary, a restraint must not only be subordinate and collateral to a separate legitimate collaboration, it also must be reasonably necessary to achieve the pro-competitive benefits of that collaboration. The district court simply failed to assess that second element. In fact, it recognized that defendants likely could not show reasonable necessity. As the court put it, that is not to say that the provision itself was output-enhancing. Mr. Strand, and you are Mr. Strand, I'm sorry. That's my problem with my card here. Pro-competitive benefits in what market? At the stage of assessing whether the ancillary restraints doctrine is properly met, we're not looking at a particular market. We're looking at is the restraint collateral and subordinate to a pro-competitive collaboration, and is it reasonably necessary to achieve those pro-competitive benefits without asking specifically where the benefits are versus where the harms are at the ancillary restraints stage. Even if we're looking at this ancillary doctrine? At the ancillary restraints stage, yes. Now, if you've got to. At yes what? I'm sorry? At yes what? Do we do have to worry about market definition at that stage? No, we do not have to worry about market definition. When you have a per se illegal restraint, market definition isn't an element of the claim. So you have an otherwise per se illegal restraint. A way out of that is an assertion of the ancillary restraints defense, and there it's appropriate to examine whether the otherwise per se illegal restraint is reasonably necessary to achieve the pro-competitive benefits of the collaboration, whatever those may be. We're not taking a position on what particular types of justifications would suffice, but it's not the case that you would be limited to looking at justifications in the labor market. If ancillary were to be satisfied and you ended up in the rule of reason, we don't take a position whether at that point cross-market balancing would be appropriate. But as to the ancillary restraint stage, you're just looking at the connection between the otherwise per se illegal restraint and the needs of the pro-competitive collaboration. So just to be clear, you don't think that there's any need in the allegations to survive this 12C motion to say that the McDonald's franchisees who were subject to this restriction, I'll call it paragraph 14, were in competition with each other. I mean, there is kind of a side debate about whether they're really in vertical relationships or whether they're in like interstate circuit or choice or us, essentially horizontal, you know, a wheel with a rim or whatever metaphor you like to use. Surely you do, as you're assessing the potential pro-competitive benefits, need to know whether they are in a complementarity relationship that we might call vertical or whether they're in a directly competitive relationship. We completely agree. The complaint would have to plead, plausibly plead, that the restraint is between horizontal competitors, actual or potential competitors. And are you taking any position on whether this complaint pleads that? We're not taking a position, but a number of the allegations in the complaint directly allege that. Okay. I'll take that. So the district court seems to have simply failed to recognize that there is a reasonable necessity aspect to the ancillary restraints doctrine. But before you continue with that thought, let me just nail down one other thing. When I read the briefs submitted by McDonald's, the entire gist of what they're saying is, this labor restraint was really just part and parcel of a giant package of provisions, I won't even call them restraints necessarily, some of them may be restrictive, others not, that help us compete better in the fast food or whatever you want to call it, euphemistically quick service market for food. And the response seems to have been, well, no, this is actually a labor market restriction, and there may be plenty of legitimate restrictions at the product market level, but the antitrust laws typically don't allow you to trade off benefits in Market A against detriments in Market B, unless it's a platform, and nobody says this is a platform. So what's your response to that? That would be correct if we got into rule of reason and that analysis were being done. So your main point is just under the right structure, this gets beyond the pleadings? That would be the case again? Our point is that in order for the district court to have found ancillarity and thereby take the case out of per se condemnation, it needed to have performed the steps of the proper test, one of which was reasonable necessity. And the court made clear that it did not understand that, not only because it said it's clear that it was not necessary because the McDonald's continued to sign up franchisees even after the provision was eliminated, but also the court specifically pointed out that the restraint was not limited to management employees who had received expensive training. It applies to entry-level employees who have had no management training, and it additionally pointed out that the restraint is not limited to a reasonable period of time, say six months, after the employee has received the expensive training. Well, yeah, so the employee could get the training back in 2015, and they're still under this restriction in 2023. Exactly. So that's our only point is that the court needed to perform the proper analysis, and it failed to do so. If there are no further questions, we would ask that this court hold that the district court erred by declaring the restraint ancillary without performing a reasonable necessity analysis and, as we describe in our brief, by interpreting Alston to limit the availability of Per Se and Quick Look Condemnation. Thank you, Your Honors. Thank you, Mr. Strand. Ms. Brass. Good morning, Your Honors. May it please the court, Rachel Brass from Gibson, Dun & Crutcher for the McDonald's Defendants Appellate. No federal court has analyzed an intra-brand restraint under the Per Se rule since Legion. So why is this an intra-brand restraint when it comes to the labor market? I mean, do you think that if these companies were they had a common owner, let's say, they would be free to engage in any kind of restrictive practice amongst themselves, even if they held themselves out as competitors and were indeed competitors and the company had no authority to hire or fire? Your Honor, in paragraph 77 of the complaint, and as appellants' plaintiffs' counsel just emphasized now, plaintiffs allege that McDonald's restaurants operated by different owners are competitors in both the labor market and in the downstream consumer market. But we know from cases like Sylvania, from cases like Business Electronics, that franchise systems can adopt restraints in the downstream markets even though they compete in those markets. But this is an upstream market. Labor is an input. And there are no end to input restraints as well. That's, for example, the Pizza Hut decision from the Tenth Circuit. So do you think that—I want to explore this. Do you think that General Motors and Ford could enter into an agreement together saying that they won't pay more than X dollars for electric batteries for their new EVs? No, Your Honor, but they're not the same brand. That's an inter-brand restraint. And the idea that McDonald's does not compete on the labor market as a brand, I think, blinks reality. Even the district court held in its initial 12B6 order that, for example, if McDonald's were collaborating together and running ad campaigns, seeking workers into the system, advertising a brand— Why does branding matter as opposed to actual ownership? You may remember one of the most famous antitrust cases. It was the General Motors Fisher Body case where everything was sold under the General Motors brand, but they were, in fact, separate. And the Supreme Court insisted that they be treated as separate. Because a franchise system is a complex business arrangement that is a combination of companies that compete together, independently owned, but under one brand. But, you know, let's go to the Sports League cases. There are hybrid methods of analysis, too. The NCAA can cooperate all at once for certain things. There are going to be so many quarters to a game, and these are going to be the rules, and so on. But yet, the 1984 decision of the Supreme Court says they are competitors, a decision which Judge Easterbrook and I particularly remember very well. Very, very well. But all the way through Alston, Brown, Pro Football, all of these cases, we need to drill in, look at the allegations, and see if the interaction that we're talking about is one that falls under the competitive model or is the interaction we're talking about the one that falls in the joint operation, joint venture, whatever you want to call it, franchise, I don't care. There are different models. So why isn't the fact that McDonald's legitimately can cooperate in some ways with its franchisees dispose of the question whether this way is one of them? Because on a number of elements of competition in the labor market, while there is autonomy, just like there's a combination of restraint and autonomy for the purchase of tomatoes. That's in paragraph 79 of the complaint. Franchisees can negotiate prices independently, but McDonald's can also impose restraints on what the ingredients are, who the approved suppliers are. Yeah, but that's not my question. My question is why, if they are separate hirers of labor, can McDonald's say, you, for the rest of your life, as long as you're working at this McDonald's, cannot be hired by a different McDonald's unless there's one of these releases? Now, that's long after the cost of any training has been amortized. We aren't talking about a more rational restraint that might last for six months or a year or maybe two years if it's a manager and then go away. I think there's two ways of looking at that question, Your Honor, both of which require analysis under the rule of reason, an approach to prove plaintiffs abandoned at the start of the pleadings and never resumed in this case. But why do you plead theory? Why does an antitrust complaint have to go into lengthy discussions about whether it's per se or quick look or rule of reason? That seems to me completely antithetical to the theory of pleading under Rule 8 and Twombly and Iqbal and anything else you can think of. You need to plead. Let's say you're only pursuing a claim under the rule of reason. You would need to plead impact in a relevant market and you would need to plead a plausible product market and a plausible geographic market. Why? Why couldn't you just plead that, as plaintiffs have done here, that here is the restraint. Plaintiff Deslandes, the French person in me can't stand this, but anyway, Deslandes tried to go and sell her services for a better price and she was blocked from doing that. That reflects not only her personal suppression in the wage market but more general suppression in the wage market. Then we can figure out, when we get to the later stages of the case, is this going to, you know, how deep a dive do the economists have to make? How deep a dive do the plaintiffs have to make? I don't see why the pleadings demand all this. Well, here, Your Honor, first the plaintiffs did affirmatively plead that they were pursuing a per se claim and a quick look claim and the district court asked if they were pursuing proof under the rule of reason. They said no. That influenced how all of discovery in the litigation was conducted. So there's all this discovery, but was the discovery focused on the class action issue or was the discovery something else? It was all of discovery merits. Discovery before class certification was briefed. So it was every question in the case, not simply phased class certification discovery. So McDonald's was never put on notice. For example— But was discovery formally closed? Yes, Your Honor. It was never put on notice.  But you argued and argued and argued. It's a little hard to see that McDonald's didn't know the rule of reason was at play. Given the arguments you were making, the briefs you were filing, you were vigorously contesting this. We argued that this case is properly analyzed under the rule of reason, yes, because there is no— Right, so there was no surprise. If you had chosen to devote some discovery resources to backing that up, you could have done that. Your Honor, we believe the discovery does demonstrate, for example, that this is an ancillary restraint, and because it's an ancillary restraint, it's properly reviewed under the rule of reason, even if you determine that these are horizontal competitors, because at the time it was adopted, it meets the standard about whether it may contribute to production and output of the enterprise as a whole, an issue that it has decided not looking at the labor market— Your Honor, there are a number of allegations in the complaint that go to that question. First, in paragraph 99, and here I'm referring to Ms. Deslandez's complaint. It's in Ms. Turner's complaint, but the numbers are different. That's at McDonald's, appendix A25. The paragraph 14 embodies norms that are widely accepted across the fast food industry and familiar to franchisees, things that someone would expect to see from an efficient franchise. It says that the restraint helped McDonald's get a significant competitive advantage and that it helped keep franchisees from stealing one another's employees. But can I ask—I mean, I'm worried about this line of thought. I mean, it sounds like you're really arguing that the antitrust laws should not prohibit monopsony, because monopsony always results in depressed prices of an input. The buyer gets whatever it is, the service, the item, the person, for a smaller amount of money. And so maybe that puts them in the context of a larger market in an advantageous position, and yet since Mandeville Island Farms, monopsony is a type of welfare-reducing behavior that the antitrust laws the Supreme Court has told us forbids. I am absolutely not saying that we should not inquire into monopsony. I'm saying we should inquire— But it will always have the effects that you're talking about. We should inquire into it under the rule of reason. I didn't see any reliance on the first sentence of 15 U.S.C. section 17 to argue that monopsony can't be pursued.  Even though section 17 says the labor of a human being is not a commodity or article of commerce, period, one might take that to say that labor market monopsonies are outside the scope of the Sherman Act, but I don't perceive you to be arguing that. That's correct, Your Honor. We're not arguing that. If we're then looking at an ancillary restraint, we look at whether or not it could have enhanced the enterprise at the time it was adopted. Here, that's in the 1950s. Well, but actually there's some dispute about that because these renewed every 20 years, so it seems that anything that was in effect at the time this complaint was filed couldn't have gone much before, I think, 1993. This wasn't Ray Kroc starting a brand new enterprise. While we would argue that because it was there at the beginning and continued, it is reasonable to look at that initial phase, it is not necessary to reach the decision of ancillary here. Regardless, it serves several pro-competitive justifications. For example, reducing friction and ensuring collaboration, a necessary element of a franchise system, which, for example, Professor Epstein recognizes in his article on antitrust over labor market. So reducing friction, so the franchisees can agree they're not going to compete with each other. They'll suppress labor market prices so they don't engage in, that sounds like kind of a Saccone vacuum to me. Let's reduce friction. We don't like these price wars, so we'll all just fix the price. If those were the allegations here, Your Honor, we might be having a different discussion, but those are not. The allegations are about a provision that McDonald's included in its franchise agreement, whether we look at it from 1957 or 1977 or 1997. So the common purchasing agent somehow, I mean, the fact that McDonald's put it in there, when each of the franchisees knew that the other franchisees had it and they mutually enforced it back and forth for one another, that gives it a horizontal tone. Well, first of all, Your Honor, there is, you know, we're not here to talk about the evidence, but there's not actual evidence of it being forced across the franchisees. Certainly alleged. But it is absolutely alleged. But it is not alleged to have been franchisees sitting and getting together, and this court told us in Townsend that the mere awareness that others might be operating in a similar way is not enough to get you over the line from just spokes to a rim. And I think analogy here instead to Toys R Us or Interstate Commerce is not an apt analogy because this is the longstanding franchise agreement, unchanged over time. That's the thing. Think of Interstate Circuit. You know, they were aware, and they knew that each was going to play a role in enforcing this system. But they were aware because of a changed practice that they were all made aware of and signed on to at the same period of time, as opposed to a vertical franchise agreement that is unchanged over time that they are all signing and that is adopted. Do you think they all think that they have different agreements with McDonald's? No, Your Honor, but the fact that you just are aware you have similar arrangements, as this court said in Townsend, is not enough to establish a rim. You have to show conscious commitment to a common scheme and some kind of act in furtherance of agreement. Why aren't those facts that need to be explored? Well, Your Honor, those facts were explored in the record. Well, so you keep going back and forth. I mean, it's kind of a screwy case. Well, what I would say is, you know. You would be in a much better position if the district court had made findings of fact and conclusions of law and granted summary judgment. But it didn't happen. It did not, Your Honor, but we do think this court could affirm the decision below, like it did in the Loeb case, on the record here, converting the case from a Rule 12c to a Rule 56 motion. Do you think we should do that? I think you could do that, based on the findings of fact that are in the class certification order and the fact that, for example, there is no evidence anywhere in the record that anyone ever adopted Paragraph 14 or employed Paragraph 14 for the purpose of wage suppression. How would you find out what was in their heads when they signed one of these agreements? Was it in an MRI machine? It would be a little late. You could depose Plink. If you're looking at the time that they signed the agreement, you could take depositions of franchisees, for example, something that Plink has selected a large amount to do. Most people don't even understand their own reasons, let alone testify about them accurately and honestly a decade later. We usually go on objective signs rather than trying to open up people's skulls. We think on the objective signs here, there are multiple pro-competitive rationales that are sufficient to move this case from a per se restraint to an ancillary restraint, or even if you want to give the plaintiffs the quick look, which we don't think Alston provides. You're over-reading Alston there. Alston doesn't forbid quick look. First of all, it was the opposite situation. It was quick look to approve, not quick look to deny. But either way, it says that we look at the vast majority of cases, and for the vast majority of cases we look at whether or not there is the rule of reason, and otherwise we only apply quick look in per se with special care when considerable experience in the type of restraint at issue can predict with confidence it would be invalidated in all or almost all circumstances. There are certainly no cases in an interbrand labor market case that would hold that, and there are a number of cases with agreements between even horizontal competitors that restrict labor markets and provide no benefit whatsoever to the participants in the labor market, like, for example, the Lectrovend case, or the Bogdan case from the Second Circuit, or the Eichhorn case from the Third Circuit, or the Aya case from the Ninth Circuit, and nonetheless decide that the rule of reason is the appropriate framework. Could you tell us a little about the competitive advantages that you do see? You said you saw them, and then you didn't elaborate. Yeah, so the first is reducing franchise infighting and fostering brand consistency and stability against interbrand competition. And for that you rely on the study, am I correct? Yeah, I mean, it's a widely recognized feature of franchise systems, but we cite Professor Epstein's article as an example of scholarship recognizing that that is a legitimate pro-competitive reason for these kinds of cases. There's no testimony in the record of any particular example of that within the McDonald's organization, is there? There is McDonald's sort of oldest living franchising system executive, Mr. Kramer. He testified that, in fact, those were reasons to have it in the system, and other current employees testified that that was a benefit of it in the system when it was still there. Rather than this come by rationale, what else does McDonald's get out of this? It encourages other types of cooperation and collaboration. For example, the franchise agreement and franchise disclosure document, which are part incorporated into the complaint by reference, tell us that McDonald's requires franchisees to devote 4.9% of their revenue to advertising. That advertising includes common advertising of jobs. When you are working to bring people into the system to improve the system's ability to compete against other brands on specific issues, it enhances the system if you are facilitating that kind of collaboration. So these are all pro-competitive advantages in the product market, right? The product you're selling. They are also pro-competitive advantages in the labor market, although for ancillarity, as the United States has said, we don't have to decide at the top if they just have to benefit the system as a whole. I know he said that. For the last two weeks, that's been an annoying question, to be very frank. When you read the briefs, that's the dark, that's the black hole of this thing. Well, if you look at Polk Brothers or Rothery Storage or Elizabeth Place or Aya, they all say, are we enhancing efficiency, productivity, and output? But we would also say that the free riding benefits, for example, apply in both the upstream and downstream labor markets, encouraging people to invest in training, training that does happen at the crew level, not simply at the management level. But even if we were to agree with you that there was some free riding possible, I don't understand the duration of this restriction on the movement of labor. I would believe that somebody trained as a crew person in McDonald's, and they, of course, need to be trained, that that training is amortized long before this restraint goes away, since this restraint never goes away. And that might be a consideration if the test was, as the United States said, reasonable necessity. It is not. It's whether it contributes to it as a whole. And if we're looking under the rule of reason, that would be a reasonable question to ask. But the plaintiffs have never alleged or attempted to prove injury in a relevant market and have forsworn any attempt to litigate this case under the rule of reason. That might have been the right inquiry in that case. It is not the one the plaintiffs here chose to pursue. I see I'm out of time, so I thank you. Thank you very much, counsel. The case is taken under advisement.